IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Brian Ellis Valbert,<br><br>             Plaintiff,<br><br>v.<br><br>South Carolina Department of Mental<br>Health, Gaylan Sanders, Harold Alexander,<br>and Dr. Peggy Wadman,<br><br>             Defendants. | CIVIL ACTION NO. 9:12-1973-RBH-BM<br><br>**REPORT AND RECOMMENDATION** |

This action has been filed by the Plaintiff, pro se, pursuant to 42 U.S.C. § 1983. Plaintiff, a civilly committed person in the Sexually Violent Predator Program (SVPP) within the South Carolina Department of Mental Health (DMH), alleges violations of his constitutional rights by the named Defendants.

The Defendants filed a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P., on January 29, 2013. As the Plaintiff is proceeding pro se, a Roseboro order was entered by the Court on January 30, 2013, advising Plaintiff of the importance of a dispositive motion and of the need for him to file an adequate response. Plaintiff was specifically advised that if he failed to respond adequately, the Defendants' motion may be granted, thereby ending his case. Plaintiff thereafter filed a response in opposition to summary judgment on March 4, 2013.



Defendants' motion is now before the Court for disposition.[1]

### Background and Evidence

Plaintiff alleges in his verified Complaint[2] that in November 2008 he was ordered to be held by the South Carolina Department of Mental Health pursuant to S.C.Code Ann. 44-48-10, et seq. [South Carolina Sexually Violent Predator Act], and that he is currently being held by the DMH in the Edisto Unit of the Broad River Correctional Institution (part of the South Carolina Department of Corrections) pursuant to inter-agency agreement. Plaintiff alleges that although he was originally provided a single bunk room for his initial processing period, he was subsequently moved to a double bunk room with another resident. Plaintiff alleges that he suffers from paruresis, an inability to use the restroom in the presence of others, and that he should therefore not be required to share a room with another resident. Plaintiff alleges that after complaining to the Defendant Sanders, the head nurse, he was placed in a room by himself for approximately six months, but that he was subsequently informed by the Defendant Alexander (another nurse) that he was going to have to share his room with another resident. Plaintiff again protested, and alleges he was told by Alexander (in the presence of Dwight Green, a mental health specialist), that he was getting a roommate and that he [Plaintiff] would be given a "shot" (Thorazine) if he did not comply.

Plaintiff alleges he complained about his assignment of a roommate to numerous

---

[1]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(e), D.S.C. The Defendants have filed a motion for summary judgment. As this is a dispositive motion this Report and Recommendation is entered for review by the Court.

[2]In this Circuit, verified complaints by pro se litigants are to be considered as affidavits and may, standing alone, defeat a motion for summary judgment when the allegations contained therein are based on personal knowledge. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

2



individuals, including the Defendant Peggy Wadman (a psychiatrist), but that Wadman refused to intervene or to report Plaintiff's mistreatment at the hands of Sanders and Alexander. Plaintiff further alleges that Wadman refused to have him examined by a qualified expert in neurology. Plaintiff alleges that he has grieved this issue, and that the medical staff is aware of his condition and the fact that he was afforded a "dry cell" while incarcerated in the SCDC. Specifically, Plaintiff alleges that while an inmate with the SCDC he was diagnosed with paruresis, also known as shy bladder, and that due to this diagnosis prison guards were ordered by medical staff to accommodate his medical condition during drug testing procedures by allowing him to use a dry cell to produce a urine sample.

Plaintiff further alleges that he has informed the staff, including Wadman and Alexander, that he was having panic attacks due to not having a private room and was not sleeping well, but that nothing has been done. Plaintiff alleges that Sanders is in charge of all room assignments, and refuses to assign him to a single occupancy room even when one is available. Plaintiff also alleges that when he attempted to grieve this issue, he was punished by "staff" by being charged with attempting to intimidate staff, resulting in loss of privileges. Plaintiff alleges that on September 7, 2011, he was seen by urologist Dr. John Rawl, who confirmed his diagnosis of paruresis. Plaintiff alleges that Dr. Rawl's medical report stated that he was to have a private room because of his condition, and that he was also placed on Rapaflo, a medication which helps with the muscles associated with his condition.

Plaintiff alleges that the Defendants have acted outside acceptable and general professional standards of care and have been deliberately indifferent to his condition, in violation of various constitutional rights. Plaintiff also asserts that the Defendants' conduct is in violation of the

3



Americans with Disabilities Act (ADA), 42 U.S.C. § 12117, et seq. Plaintiff seeks monetary damages, as well as prospective relief to be treated with the appropriate standard of medical care. See generally, Verified Complaint.

In support of summary judgment in the case, the Defendant Peggy Wadman has submitted an affidavit wherein she attests that during the relevant time period she was Medical Director for the Sexually Violent Predator Program with the Department of Mental Health, and was also Medical Director for the Forensic Division. Wadman attests that Plaintiff is a civilly committed person in the sexually violent predator program within the DMH. Wadman attests that she performed and prepared Plaintiff's pre-commitment psychiatric evaluation dated May 27, 2008 (attached Exhibit I to her affidavit), and that she also reviewed Plaintiff's SCDC records in addition to numerous other documents. Wadman attests that at no time did Plaintiff give a history to the SCDC of having paruresis or shy bladder syndrome; that there is no evidence in the SCDC records that he ever complained about paruresis, was diagnosed with paruresis, or was treated for paruresis; and that during her interview with the Plaintiff, he denied a history of medical problems or any current medical conditions, including shy bladder syndrome.

Wadman attests that in a Request to Staff dated September 11, 2009 (attached Exhibit II to her affidavit), Plaintiff claimed that he has shy bladder syndrome because he was gang raped by three black men in prison. Wadman attests that there is no evidence or history of Plaintiff having been gang raped at any time, and that Plaintiff never mentioned this to her during his Pre-commitment Evaluation over a year earlier. Wadman further attests that, according to SVPP records, after Plaintiff complained about his shy bladder the nursing staff and the contract physician provided care and treatment, but because Plaintiff continued to complain about his shy bladder, he was

4



ultimately referred to a urologist on September 7, 2011. Wadman attests that the urology records (attached Exhibit III to her affidavit) indicate that Plaintiff told the urologist he has always had a shy bladder and cannot urinate if he has a roommate. However, Wadman attests that Plaintiff's physical examination was normal. A bladder scan showed elevated residential urine because Plaintiff claimed he could not urinate with guards in the room, and the urologist provided Plaintiff with some medication for his complaints.

Wadman attests that during three followup visits, Plaintiff's condition improved with decreasing residential urine, while a "scope" determined that Plaintiff did not have any mechanical problems causing an inability to urinate. Wadman attests that during a September 28, 2011 office visit, the urologist recommended that Plaintiff be provided a private residence "if possible" to help his voiding habits, and that during Plaintiff's last office visit on May 10, 2012, while the urologist recommended Plaintiff have a private toilet, he did not recommend a private room. Wadman further attests that the urologist never concluded or stated that the length of time Plaintiff was unable to urinate in a timely manner had caused bladder desensitization that resulted in Plaintiff being unable to fully empty his bladder, that there are no tests that can be done to confirm paruresis, and that this condition is diagnosed and treated by history only.

Wadman attests that Plaintiff's Axis I diagnosis is "Pedophilia, Sexually Attracted to Both, Nonexclusive Type", and his Axis II diagnoses is "Antisocial Personality Disorder". Wadman attests that Plaintiff has a documented history of lying and of being very manipulative, that (other than Plaintiff's complaints) there is no evidence that shows Plaintiff has had difficulty urinating with a roommate present, he has not had any blood in his urine or any panic attacks or sleep problems as a result of not being in a private room, and that no resident is injected with Thorazine for refusing



to follow an order. Wadman attests that she did not deny medical care to Plaintiff and did not refuse to send him to a urologist, nor is she aware of any mistreatment of the Plaintiff by any medical staff, including the Defendants Sanders and Alexander. Rather, Plaintiff's written and verbal complaints indicate that he is determined in any way he can to get a special, private room in a select location. Wadman also attests that while she is not responsible for room assignments, that from her review of the SVPP records, Plaintiff is presently housed in a single occupant room, and has been for several months.[3] Wadman attests that, based on Plaintiff's SVPP records and the facts as set forth in her affidavit, neither she nor the Defendants Sanders or Alexander have been deliberately indifferent to Plaintiff's medical needs. See generally, Wadman Affidavit, with attached Exhibits.

The Defendant Galen Sanders has submitted an affidavit wherein he attests that both he and the Defendant Harold Alexander are registered nurses, and that during the relevant time period they were both employed by DMH to provide nursing care and treatment to residents in the Sexually Violent Predator Program (SVPP). Sanders further attests that he is the Director of Nursing, and makes the final decision regarding room assignments. Sanders attest that neither Alexander nor Wadman are involved in decisions concerning room assignments. Sanders attests that when Plaintiff entered the SVPP on November 10, 2008, he did not give a history to anyone about having paruresis or "shy bladder syndrome", although in a Request to Staff dated December 9, 2008 (attached Exhibit 1 to Sanders' Affidavit), Plaintiff did request to be moved to a room on the ground floor because he had COPD and back problems. It is noted, not coincidentally, that ground floor rooms are single occupant. Sanders attests that he denied this request because Plaintiff did not have a history of COPD. In a subsequent Request to Staff dated January 29, 2009 (Attached Exhibit 2 to Sanders'

---

[3]Wadman's affidavit is dated January 25, 2013.



Affidavit), Plaintiff asked to be moved to a room with a resident he knew from another institution. Sanders attests that Plaintiff did not mention anything about having a "shy bladder" in either of these two requests.

Sanders attests that in a Request to Staff dated February 9, 2009 (Attached Exhibit 3 to Sanders' Affidavit), Plaintiff asked to be moved to another room because he was having trouble with his roommate. Sanders attests that he moved Plaintiff to a room that did not have a roommate, but notified Plaintiff that he would get another roommate later. The very next day, Plaintiff submitted a Request to Staff which mentioned that he could not go to the bathroom if someone else is in the room. See Attached Exhibit 4 to Sanders' Affidavit. Sanders attests that he again told Plaintiff that he would eventually get another roommate, although several months passed before Plaintiff was actually assigned a new roommate.

Sanders attests that Plaintiff then wrote a Request to Staff dated September 11, 2009 (attached Exhibit 5 to Sanders' Affidavit), in which he claimed that he could not use the restroom when anyone was around because he had been gang raped by three black men in prison and had also been raped when he was younger. However, Sanders attests that in his Pre-commitment Evaluation on May 20, 2008, Plaintiff denied that he had been sexually abused in the past. Sanders further attests that during Plaintiff's initial assessments after his commitment, he made no mention of a history of sexual abuse or of being raped by three black men. Nevertheless, since Plaintiff claimed he was getting blood in his urine from having to wait to go to the bathroom due to the fact that he now had a roommate, Plaintiff was told to make a medical request. That same day, September 11, 2009, Plaintiff submitted a medical request (attached Exhibit 6 to Sanders' Affidavit) in which he claimed that he was having to wait until he was in severe pain before he could go to the bathroom



because he could not use the bathroom in front of his roommate. Plaintiff wrote a second medical request on September 16, 2009 (attached Exhibit 7 to Sanders' Affidavit), addressed to Dr. Wadman, referencing a request he had made to see her back on September 5, 2009, to which Dr. Wadman responded by telling Plaintiff that room assignments were made by the treatment team and nursing staff, but that if he had a medication concern, she would see him about that. Id.

Plaintiff submitted another Request to Staff dated November 18, 2009 (attached Exhibit 8 to Sanders' Affidavit) in which he asked to be moved to a room without a roommate, this time stating that having been raped in prison was causing him to have panic attacks and that he could not sleep well. Plaintiff was advised that no room changes were being made at that time, but that his request would be considered in the future. Plaintiff made the same complaint in a Request to Staff dated November 25, 2009 (attached Exhibit 9 to Sanders' Affidavit), and was told that he had been prescribed medication for his symptoms of panic attacks and sleep problems, and that he needed to discuss coping skills with his therapist to deal with his anxiety.

Sanders attest that on January 25, 2010, Plaintiff submitted a medical request (attached Exhibit 10 to Sanders' Affidavit) in which he complained of "weak urination". Plaintiff was seen in the nursing clinic for his complaint. In a medical request dated February 21, 2010 (attached Exhibit 11 to Sanders' Affidavit), Plaintiff made the same complaint and that he was noticing blood in his urine in the morning. Plaintiff was again seen and evaluated by the nurse practitioner. Sanders attests that during all of this time, Plaintiff had a roommate and had made adjustments to be able to urinate.

Sanders attests that, over a year later, Plaintiff submitted a Request to Staff dated March 9, 2011 (attached Exhibit 12 to Sanders' Affidavit) in which Plaintiff asked to be moved to



another room, which was denied.  Sanders notes that the room Plaintiff was requesting was upstairs, even though when Plaintiff first started asking for a different room in 2008, he had said he could not be in an upstairs room because he had COPD.  The next day, March 10, 2011, Plaintiff submitted a Medical Request (attached Exhibit 13 to Sanders' Affidavit) complaining of having urine with a strong and foul odor as well as a sore bladder.  Plaintiff was seen in the nursing clinic for his complaint.  On March 30, 2011, Plaintiff submitted another Request to Staff (attached Exhibit 14 to Sanders' Affidavit) asking to be moved to another room, which was again denied.  Sanders notes that Plaintiff was in a double bunk room without a roommate at that time.

Sanders attests that on May 4, 2011, Plaintiff submitted a Medical Request (attached Exhibit 15 to Sanders' Affidavit) asking for a urology appointment.  Sanders attests that the SVPP doctor saw Plaintiff and addressed his concerns.  Id.  However, on August 25, 2011, Plaintiff again submitted a Medical Request asking to be seen by a urologist (attached Exhibit 16 to Sanders' Affidavit), and this time Plaintiff's request was approved.  Plaintiff was seen by the urologist on September 27, 2011.  Sanders notes that, at that time, Plaintiff was assigned to a single occupancy room because of allegedly not being able to void in close proximity to anyone.  Sanders also notes that, although he was in a single occupancy room, on December 4, 2011 Plaintiff requested a move to a room on the second floor (contrary to his previous request in which he stated he could not be in a second floor room because of back problems, COPD and dizziness), which was denied.  See attached Exhibit 17 to Sanders' Affidavit.  Sanders notes that, with the exception of three single occupancy rooms, all of the rooms on the second floor are "double bunked" and therefore subject to double occupancy.



Sanders attests that Plaintiff submitted a Grievance on April 19, 2012 (attached Exhibit 18 to Sanders' Affidavit) in which he complained that, even though he had a single room, he wanted to block the view of the toilet with a curtain or he wanted to move to another room that had a wall that blocked the view of the toilet. This request was denied, with Plaintiff being reminded that he could use a 5 x 8 privacy card to block the window while using the bathroom.[4] Sanders attests that Plaintiff filed the same Grievance again on May 7, 2012, which was denied for the same reasons. See attached Exhibit 19 to Sanders' Affidavit. On July 9, 2012 Plaintiff requested to be moved to another specific room, which was denied. See attached Exhibit 20 to Sanders' Affidavit.

In sum, Sanders attests that the initial reasons Plaintiff gave for wanting a different room or for not having a roommate had nothing to do with a "shy bladder" problem, and that Plaintiff did not complain about an alleged "shy bladder" until almost three months after his admission to the facility. Sanders further attests that during the times Plaintiff had a roommate, he made the necessary adjustments to be able to go to the bathroom, and that Plaintiff is presently housed in a single occupant room and has been for several months. Sanders also attests that, when going to the bathroom, Plaintiff can block the outside view to the toilet with a privacy card for the amount of time it takes for him to use the bathroom. Sanders also attests that no resident is injected with Thorazine for refusing to follow an order.

Finally, Sanders attests that Plaintiff has been evaluated by a urologist, who only indicated that Plaintiff should be provided a private residence to help his voiding habits "if possible", and that during Plaintiff's office visit with the urologist on May 10, 2012, the urologist only recommended that Plaintiff have a private toilet, not a private room. Sanders attests that neither he

---

[4]The card was to remain in place only for the time needed to use the bathroom. Id.



nor the Defendant Alexander have been deliberately indifferent to Plaintiff's medical needs. See generally, Sanders Affidavit, with attached Exhibits.

## Discussion

Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. The moving party has the burden of proving that judgment on the pleadings is appropriate. Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991). Once the moving party makes this showing, however, the opposing party must respond to the motion with specific facts showing there is a genuine issue for trial. Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). Further, while the Federal Court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, see Cruz v. Beto, 405 U.S. 319 (1972); Haines v. Kerner, 404 U.S. 519 (1972), the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts which set forth a Federal claim, nor can the Court assume the existence of a genuine issue of material fact where none exists. Weller v. Dep't of Social Services, 901 F.2d 387 (4th Cir. 1990). Here, after careful review and consideration of the arguments and evidence submitted, the undersigned concludes that the Defendants are entitled to summary judgment in this case.

First, although as a civilly committed inmate, Plaintiff has a liberty interest in receiving reasonable care in reasonably non-restrictive conditions of confinement; see Youngberg v. Romeo, 457 U.S. 307, 324 (1982); he has no constitutional right to a single resident room, even though (as is clear in the evidence) he has been provided one due to his repeated complaints about



having to share a room with another resident. Treece v. McGill, No. 08-3909, 2010 WL 3781695 at * 4 (D.S.C. Sept. 21, 2010)["A civilly committed individual under the SVPA most closely resembles the custody status of a pre-trial detainee."] (quoting LaSure v. Doby, No. 06-1527, 2007 WL 1377694 at * 5 (D.S.C. May 8, 2007); Smith v. Carey, No. 10-1247, 2012 WL 6923338, * 5 (N.D.N.Y. Dec. 28, 2012)[Involuntarily committed individuals do not have a right to privacy in their rooms], adopted by, 2013 WL 237722 (N.D.N.Y. Jan. 22, 2013).

As for Plaintiff's medical care, while Plaintiff does retain a constitutional right to medical care; Tillman v. Dixon, No. 10-5032, 2011 WL 5119187 at * 9 (W.D.Wash. Aug. 12, 2011)[The rights of those civilly committed are analyzed using same standards that apply to pretrial detainees, with the Eighth and Fourteenth Amendments both guaranteeing that inmates and detainees receive constitutionally protected medial care], adopted by, 2011 WL 5118750 (W.D.WAsh. Oct. 27, 2011); the evidence reflects that Plaintiff has been repeatedly seen and evaluated for his complaints, and there is nothing in the evidence before the Court to create a genuine issue of fact as to whether a constitutional violation has occurred with respect to Plaintiff's care and treatment by the Defendants. Youngberg, 457 U.S. at 323 [liability may be imposed only when evidence is submitted to show that "the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment"]; Farmer v. Brennen, 511 U.S.. 825, 834-835 (1994)[A "sufficiently culpable state of mind" entails more than mere negligence, but less than conduct undertaken for the purpose of causing harm]; Patten v. Nichols, 274 F.3d 829, 843 (4th Cir. 2001)[Defendant's actions must have "so substantially departed from professional standards that their decisions can only be described as arbitrary and unprofessional"]; Belding v. Gintoli, No. 04-2416,

12



2006 WL 2707200, * 5 (D.S.C. Sept. 15, 2006)[same]; Smith v. Carey, 2012 WL 6923338 [same].

Further, the medical records from Dr. John Wofford (Plaintiff's urologist) reflect no serious medical problems, and in fact show that Plaintiff's examinations have revealed him to be "generally healthy and . . . in no apparent distress". See Exhibit (Docket No. 33-5, p. 5). Dr. Wofford's only recommendation is that, because of Plaintiff's complaint about having a shy bladder, he should be provided a private residence "if possible" in order to help his voiding habits. There is no evidence of any mistreatment or "substantial departure from accepted professional judgment, practice, or standards" in the exhibits before the Court, and Plaintiff's own conclusory and self serving allegations in his Complaint of constitutionally deficient medical care and tretment, without any supporting evidence, are not sufficient to establish liability with respect to any named Defendant.[5]  House v. New Castle County, 824 F.Supp. 477, 485 (D.Md. 1993) [Plaintiff's conclusory allegations insufficient to maintain claim]; Papasan v. Allain, 478 U.S. 265, 286 (1986)[Courts need not assume the truth of legal conclusions couched as factual allegations.]; Bender v. Suburban Hospital, Inc., 159 F.3d 186 (4th Cir. 1998); Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987)["Even though pro se litigants are held to less stringent pleading

---

[5]This finding is with respect to the three natural Defendants, who are subject to suit for damages in their individual capacities in a § 1983 lawsuit. However, the Defendant South Carolina Department of Mental Health, as a state agency, enjoys Eleventh Amendment immunity from suit in this Court, and is therefore entitled to dismissal as a party Defendant even if the § 1983 claims against the three natural Defendants were sufficient to proceed. Bates v. SCDC, No. 11-3140, 2012 WL 5381785 at * 2 (D.S.C. Oct. 19, 2012)[Finding that South Carolina Dep't. of Mental Health, as a state agency, is an integral prat of the State and entitled to Eleventh Amendment immunity.] adopted by, 2012 WL 5381718 (D.S.C. Nov. 1, 2012); see also Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 99 (1984); Will v Michigan Dep't of State Police, 491 U.S. 58, 66, 71 (1989); Brooks-McCollum v. Delaware, 213 Fed.Appx. 92, 94 (rd Cir. 2007); Metz v. Supreme Court of Ohio, 45 Fed.Appx. 228, 236, 237 (6th Cir. 2002); Coffin v. South Carolina Dep't of Social Services, 562 F.Supp. 579, 583-585 (D.S.C. 1983); Belcher v. South Carolina Board of Corrections, 460 F.Supp. 805, 808-809 (D.S.C. 1978).



standards than attorneys the court is not required to 'accept as true legal conclusions or unwarranted factual inferences.'"]; Hill v. Dekalb Regional Youth Detention Center, 40 F.3d 1176, 1188-1189 (11th Cir. 1994)["An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed"], overruled in part by Hope v. Pelzer, 536 U.S. 730, 739 n. 9 (2002).

Finally, to the extent Plaintiff's complaint could be construed as asserting a claim under the ADA, this claim would be cognizable only to the extent Plaintiff alleges that he was, by reason of a disability, excluded from participation in, or denied the benefits of the services, programs, or activities of, a public entity or was subjected to discrimination by any such entity. 42 U.S.C. § 12132. Plaintiff has submitted no evidence whatsoever to meet this standard, or to create a genuine issue of fact as to whether he has been discriminated against in violation of the ADA. See, Iseley v. Beard, 200 Fed. Appx. 137, 142 (3d Cir. 2006)[in order for a claim to be cognizable under the ADA, a plaintiff must be able to show that he was excluded from services or programs "on the basis of his disability"] (citing Bryant v. Madigan, 84F.3d 246, 248 (7th Cir. 1996)]; Bryant v. Madigan, 84 F.3d 246, 249(7th Cir. 1996) [the ADA is not "violated by a prison's simply failing to attend to the medical needs of its disabled prisoners]. Therefore, to the extent Plaintiff has intended to assert a claim under the ADA, it is without merit and should be dismissed.

## Conclusion

Based on the foregoing, it is recommended that the Defendants' motion for summary judgment be **granted**, and that this case be **dismissed**.



14

The parties are referred to the Notice Page attached hereto.

　　　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　Bristow Marchant
　　　　　　　　　　　　　　　　　　　　　　　United States Magistrate Judge

March 12, 2013
Charleston, South Carolina



**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Court Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. In the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three (3) days for filing by mail.  Fed. R. Civ. P. 6(a) & (e).  Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections to:

> Larry W. Propes, Clerk
> United States District Court
> Post Office Box 835
> Charleston, South Carolina 29401

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985).

